321 So.2d 227

**In re Noah Earl TOLBERT**

**v.**

**STATE of Alabama.**

**Ex parte Noah Earl Tolbert.**

**SC 1136.**

Supreme Court of Alabama.

Sept. 4, 1975.

J. Massey Relfe, Jr., Birmingham, for petitioner.

**740**

William J. Baxley, Atty. Gen. and Kermit M. Downs, Asst. Atty. Gen., for the State.

SHORES, Justice.

We granted certiorari in this case because the court has not considered the constitutionality of the Alabama Worthless Check Act enacted by the 1971 Legislature, Act No. 2479, Vol. V, page 3958, approved October 1, 1971, and now carried as Title 14, §§ 234(9)–(21), Code of Alabama Recompiled 1958, Pocket Part. The Court of Criminal Appeals held the act constitutional.

The legislature stated the purpose of the act as follows:

"It is the purpose of this act to provide a remedy for the evil of giving checks on a depository without first providing sufficient funds or credit in such depository to pay the checks on presentment after the payment date written on the check. Also, it is the purpose of this act to remedy the situation where a check is given on a nonexistent depository or on

one where the drawer has no account. Such present activity tends to create the circulation of worthless checks on banks, bad banking, check kiting, and a mischief to trade and commerce." (Section 1)

The petitioner was indicted for alleged violations of this act and the jury returned a verdict of guilty and fixed a fine at $5,000. This judgment of conviction was affirmed by the Court of Criminal Appeals.

The facts of this case as pertinent to our decision are: Mrs. Tolbert, the defendant, had for several years bought eggs from a Mr. Hogan. Mrs. Tolbert would send her truck to Mr. Hogan's place of business in Georgia and pick up a load of eggs. When a load of eggs was picked up, a check covering the cost of the last load was sent. In other words, a check covering the cost of the preceding load was delivered to Mr. Hogan when the next load was picked up. On October 9, 1972, Mrs. Tolbert sent her truck to Mr. Hogan's place of business; and the driver delivered to Mr. Hogan a check in the amount of $893.70 for payment of eggs received the preceding week. It is this check which was the subject of the indictment.

The evidence is without conflict that prior to the October 9, 1972, check, Mrs. Tolbert had delivered checks to Mr. Hogan which had been returned for insufficient funds. Several such checks were outstanding in October of 1972, totaling several thousand dollars.

Mr. Hogan testified that he had called Mrs. Tolbert a number of times about the outstanding checks, and went to Oneonta to see her about the matter in December, 1972. A that time, the parties had a conversation about the indebtedness; and Mrs. Tolbert admitted that she owed the money and suggested that she sign a note for the full amount of all outstanding checks. The October 9th check had not been presented for payment in December, 1972. Following

this meeting, a note in excess of $8,000 was executed by Mrs. Tolbert and delivered to Mr. Hogan. This note was payable July 8, 1973.

On May 7, 1973, the October 9th check was presented to the drawee bank and was stamped "ACCOUNT CLOSED." The grand jury returned the indictment in this case in August, 1973.

The petitioner challenges the constitutionality of the Alabama Worthless Check Act, contending that it is unconstitutionally vague and ambiguous; that its provisions are in conflict; and that it violates Article 1, Section 20 of the Constitution of 1901, providing "That no person shall be imprisoned for debt."

Section 5 of the Act provides:

"It shall be unlawful for any person to draw a check, or to cause or direct the drawing of a check, with intent to defraud, on any depository which does not actually exist or on any existing depository in which the maker, drawer, or payer of the check has no check account, knowing at the time of the drawing of such check that the named depository does not exist or that the maker, drawer, or payer of the check has not [sic, no] check account with the existing, named depository."

It is the contention of the petitioner that this section is in conflict with Section 1, which speaks in terms of presentment, and also Section 9, which provides:

"As against the person drawing the check, or the person causing or directing the drawing of the check, the drawing of such check, payment of which is refused by the depository, shall be prima facie evidence of intent to defraud and of knowledge of insufficient funds in or credit with such depository, provided such person has not paid the holder of the check the amount due thereon within ten (10) days after receiving notice that

payment of such check was refused by the depository. This section also applies to postdated checks, where payment is refused by the depository on presentment after the postdate."

We think it is clear that the offense is complete when the check is drawn (meaning as defined by the act "drawing, uttering, issuing, or delivering," Section 3), *with the intent to defraud, knowing at the time of drawing* that there are insufficient funds in the drawee bank to cover such check, or *knowing at the time of drawing* that the depository on which the check is drawn does not exist, or that drawer has no account with an existing depository.

■ We find no fatal conflict between the quoted provisions of the act. Clearly, the act requires the prosecution to prove specific intent to defraud. One commentator has said in this regard:

" . . . Because proving such intent can be an elusive undertaking, the prosecutor usually has available two methods of doing so. First, he may always prove the requisite intent by direct or circumstantial evidence. In addition, most insufficient funds statutes contain a section providing for prima facie proof of intent to defraud.

" . . .

"Prima facie evidence sections usually operate against only the maker or drawer.

. . . . . .

"The acts that must be proved in order to raise the inference usually are (1) the making or drawing of the instrument by the defendant and (2) the refusal of payment by the drawee bank. . . ." Insufficient Funds Checks in the Criminal Area: Elements, Issues, and Proposals, 38 Mo.Law Review 432, 437, 438 (1973).

■ As we read Section 9, it is a legislatively created aid to the prosecution in proving the requisite elements of intent to defraud; or knowledge on the part of the drawer, either that there were or might be at presentment insufficient funds to cover the check; or that the drawer had knowledge at the time of the drawing of the check that the drawer had no account in the drawee bank. A showing at the trial that the check had been presented, and that payment had been refused for either of the statutory reasons, is prima facie evidence of the drawer's intent to defraud with knowledge of such deficiency. This section does not conflict with Sections 1 or 5, the latter clearly stating that the offense is committed when the check is drawn with intent to defraud or with knowledge, etc. Section 9 simply provides a method by which the prosecution can discharge its duty to show such intent and knowledge, provided, in the language of this section, ". . . such person [drawer] has not paid the holder of the check the amount due thereon within ten (10) days after receiving notice that payment of such check was refused by the depository. . . ."

For reasons which will be addressed shortly, this section has no operation in the case before us.

■ The petitioner argues that Section 9 leaves criminal liability to the discretion of a third party (the bank) and thereby denies due process and equal protection to the drawer, citing *People v. Vinnola*, 177 Colo. 405, 494 P.2d 826 (1972). In that case, the Supreme Court of Colorado, in holding that the Colorado bad check statute was unconstitutional, referred to the prima facie section and determined that ". . . Criminal liability and punishments should not be predicated upon a third party's unfettered discretion." (494 P.2d at 831) We agree with this general statement, but do not agree that the prima facie section creates a presumption of guilt; but, in appropriate cases, simply provides that the state has discharged its burden of showing intent to defraud and knowledge on the part of the drawer, there-

by shifting the burden of proof as to these elements to the drawer. See *State v. Coleman*, 17 Utah 2d 166, 406 P.2d 308 (1965). As we construe Section 9, it does not relieve the prosecution of the burden of proving the defendant's guilt beyond a reasonable doubt and to a moral certainty. There seems to be a rational relationship between the facts proved, i. e., the drawing of the check, refusal of payment, failure after notice to subsequently pay the holder, and the prima facie presumption based upon such proven facts, i. e., intent to defraud and knowledge of insufficient funds. We think the relationship is sufficient to comply with constitutional standards. *Leary v. United States*, 395 U.S. 6, 36, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969).

In construing this principle in *Goolsby v. State*, 213 Ala. 351, 104 So. 901 (1925), the following was cited with approval:

" 'That a legislative presumption of one fact from evidence of another may not constitute a denial of due process of law or a denial of the equal protection of the law; it is only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate. So, also, it must not, under guise of regulating the presentation of evidence, operate to preclude the party from the right to present his defense to the main fact thus presumed. If a legislative provision not unreasonable in itself, prescribing a rule of evidence, in either criminal or civil cases, does not shut out from the party affected a reasonable opportunity to submit to the jury in his defense all of the facts bearing upon the issue, there is no ground for holding that due process of law has been denied him.'—*Mobile, J. & K. C. R. R. Co. v. Turnipseed*, 219 U.S. 35, 31 S.Ct. 136, 55 L.Ed. 78, 80, 81, 32 L.R.A. (N.S.) 226, Ann.Cas.1912A, 463." (213 Ala. at 355, 104 So. at 905)

■ In arguing that Section 9 invalidates the act, the petitioner relies on *Goolsby*, supra. This court held in *Goolsby* that a prima facie section, similar to the one in Act No. 2479, stripped the defendant of the "presumption of innocence." However, at that time, the rules of evidence in this state precluded the defendant from testifying as to his uncommunicated motives, purpose, or intention. In *Goolsby*, the court observed that such testimony was not allowed under the statute for the purpose of rebutting the statutory presumption. That evidentiary rule no longer exists in Alabama. *Starr v. Starr*, 293 Ala. 204, 301 So.2d 78 (1974). Thus, a defendant is free to testify as to his intent and mental process to rebut any presumption arising from the prima facie section of the Worthless Check Act.

■ Petitioner next contends that the act is nothing more than a means whereby a criminal statute is used to enforce a civil debt, and therefore is violative of Article 1, Section 20, Constitution of 1901. Every state in the union, except Vermont, has a criminal statute dealing with bad checks. Many of these statutes have been challenged on the ground that they allow imprisonment for debt. See Annot. 23 A.L.R. 459 (1923). Most of them have survived the constitutional challenge. But we agree with the petitioner that if improperly employed to collect a civil debt, such would be an unconstitutional application of such statutes. We further agree that such statutes lend themselves to use by the unscrupulous who seek only payment of debts and have no interest in criminal prosecution other than as a means of collecting money allegedly due them. This court has repeatedly condemned the use of threat of prosecution as a means of collection of worthless checks. *Goolsby*, supra.

Additionally, this court has spoken with respect to the constitutional provision prohibiting imprisonment for debt, and recognized that this prohibition established a broad public policy ". . . inimical

. . . to the incarceration of a debtor as a means of coercing payment . . . ." *Carr v. State*, 106 Ala. 35, 38, 17 So. 350, 351 (1894). Some courts, also recognizing that such statutes can be improperly utilized, have specifically recognized that the innocent drawer who may be wrongfully prosecuted has a remedy of malicious prosecution against the payee. *Kitchens v. Barlow*, 250 Miss. 121, 164 So.2d 745 (1964).

The legislature recognized that such abuses could take place and provided in Section 13 that:

"Any person who has filed a complaint . . . or who has furnished information . . . which has resulted in the acceptance by such district attorney or county solicitor of such a complaint . . . who shall suggest such case be dismissed without just cause or legal excuse shall be taxed with all costs accruing in the proceeding."

■ We point out that such provision does not preclude a suit for malicious prosecution. Further, in upholding the constitutionality of the Worthless Check Act, we should not be misunderstood as sanctioning its use for debt-collecting purposes. In addition to subjecting himself to a suit for malicious prosecution, a party using this statute for debt-collecting purposes may be subject to liability for abuse of process. *Hotel Supply Co. v. Reid*, 16 Ala.App. 563, 80 So. 137 (1918).

Attorneys should also pay heed to the admonition contained in DR 7–105, Code of Professional Responsibility of the Alabama State Bar:

"A lawyer shall not present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter."

EC 7–21 of that Code states:

"The civil adjudicative process is primarily designed for the settlement of disputes between parties, while the criminal process is designed for the protection of society as a whole. Threatening to use, or using, the criminal process to coerce adjustment of private civil claims or controversies is a subversion of that process; further, the person against whom the criminal process is so misused may be deterred from asserting his legal rights and thus the usefulness of the civil process in settling private disputes is impaired. As in all cases of abuse of judicial process, the improper use of criminal process tends to diminish public confidence in our legal system."

■ We turn now to a consideration of the application of the Worthless Check Act to the facts of this case. As stated at the beginning of this opinion, Mr. Hogan came to Alabama in December, 1972. Mrs. Tolbert executed and delivered to him a note covering the amount of money she owed him, evidenced by several outstanding checks, including the October 9th, 1972, check which is the subject of this prosecution. At that time, the October 9th check had never been presented to the drawee bank for payment. Mr. Hogan accepted the note, but began this prosecution prior to the due date of the note. The evidence is without dispute that the note was taken in payment of the debt evidenced by the check. It is true that a negotiable instrument, to be negotiable, must be payable in money. Code of Alabama, Title 7A, § 3–104(1)(b). This does not preclude, however, payment in anything of value if the parties so agree. Therefore, in December, 1972, the petitioner made good the check, before it was presented for payment, by executing a note and delivering it to the payee of the check. Concededly, the note covered the amount of the check.

■ Under the provisions of Section 9, the drawer of a check can escape the evidentiary presumption of intent to defraud by making good a bad check within ten days after notice of its dishonor. Surely payment before dishonor should

have the same effect. Here, Mrs. Tolbert gave the payee of the check a note before the check was ever presented for payment. It would be incongruous indeed if one could avoid the implications of intent to defraud by making good a check after notice of dishonor, but not do so by making good the check prior to its dishonor. Clearly the legislature intended that this section was to relieve a drawer from the presumption of evil intent if payment were made on the check any time from the drawing of the check up to ten days after notice of its dishonor.

For this purpose, we perceive no difference between payment of the check and substitution of a note in its stead, where the note is accepted by the payee.

We emphasize that such payment does not destroy any criminality that may have existed if the check were drawn with intent to defraud, but merely prevents the prosecution from invoking the use of the prima facie section. The offense involved is theoretically complete when the check is drawn, with intent to defraud, the drawer knowing that there are insufficient funds to cover the same, or that the drawer has no account with the drawee, or that no such drawee exists. Thus, it is of no consequence if the drawer later pays the payee, or when he pays him, in so far as the crime itself is concerned. The payment has relevance only as it relates to the prima facie section. The trial court erred, therefore, in charging the jury that the bank's refusal to pay the check, which was the subject of this prosecution, was prima facie evidence of the defendant's intent to defraud the payee.

The judgment of the Court of Criminal Appeals is reversed and the cause is remanded to that court for the entry of a judgment in accordance with this opinion.

Reversed and remanded.

All the Justices concur except ALMON, J., not sitting.