The United States Court of Appeals for the Fifth Circuit certified to our Court pursuant to Article 5, Section 140 (b)(3) of the Alabama Constitution, as amended, 1973. The facts and questions certified to this Court are as follows:
"Appellee, Southeastern Financial Corporation (`Southeastern'), instituted this action against Appellant, John Smith (`Smith') for recovery of three worthless checks, together with a reasonable attorney's fee and punitive damages.
"Prior to the events underlying this action, Southeastern entered into a factoring agreement with Danube Carpet Mills, Inc., whereby Southeastern received Danube's accounts receivable for collection. The accounts so factored were `without recourse', i.e., Southeastern shouldered the risk of noncollection. In return, Southeastern received from Danube a commission on the account of one per cent (1%) and interest at the rate of two per cent (2%) above the current prime rate.
"Carriage House Mobile Homes, Inc. purchased carpet from Danube for use in its manufacture of mobile homes. Carriage House purchased such carpet on open account.
"Smith was employed by Carriage House as its dispatcher and was also a stockholder in the corporation. Sometime after his purchase of stock, Smith was approached by Woody Lacy, President of Carriage House, and asked to be Secretary-Treasurer of the corporation and co-signatory on all corporate checks. Smith agreed.
Catherine Thrasher, secretary and bookkeeper for Carriage House prepared a `daily management report' of the corporation, showing the daily balance in the general corporate checking account. Despite the fact that Smith was furnished with a copy of the report, he rarely relied on it, leaving the daily finances of the corporation to Lacy and Ms. Thrasher. Despite his capacity as an officer, Smith's working office was in a small trailer behind the brick office which housed the other corporate offices.
"Smith's co-signatory on the corporate checks was Mr. Lacy. Ms. Thrasher brought the checks out to defendant's office for his signature. At times, he would figure, along with her, the amount the corporation could expect as income from the sale of trailers and thus the amount the corporation would have available to disburse to suppliers. Occasionally he would sign sheets of checks in blank, leaving it to Lacy to make the final decision as to the amount and the payee.
"On November 5, 1973, Carriage House established a General Account with First State Bank of Phil Campbell, both Lacy and Smith being co-signatories on the checking account. At the same time, an arrangement was made between the bank and J.H. Porter, at that time the majority stockholder, which had the following effect: Porter established a personal account upon which the bank could draw to cover checks deposited by the corporation which were dishonored by either the drawer or the drawee bank. In this way, checks deposited in the corporation were honored immediately, without the bank's waiting for the checks to clear. *Page 332 
"On December 4, 1973, Porter sold his remaining stock in Carriage House and ended his `guarantee' with the bank. Thereafter, Porter continued to assert control of the corporation by continuing to intercept checks destined for the corporation and to direct them to his own use. This action was done to protect his funds against a loss of the funds he had placed in escrow to guarantee the corporation receipts.
"In the latter part of November, 1973, the corporation began a rapid decline. Approximately $48,000.00 worth of dealers' checks, payable to the account of Carriage House were dishonored, plus Porter intercepting other dealer checks. During this time, and up until the account went inactive, on December 21, 1974, approximately $140,000.00 in checks were drawn against the general account, for which there were inadequate funds to cover them.
"During this period, Smith continued to sign checks drawn against the corporate account. While he knew that the daily management reports often indicated a negative balance, he nevertheless thought that the checks coming in from dealers would be adequate to cover the checks issued to suppliers. Smith knew that Porter had sold his stock to Gooch and that Porter was intercepting some of the checks coming in from dealers.
"Danube Carpet Mills, and subsequently Southeastern, received three bad checks from Carriage House. The first, Check No. 512 (Plaintiff's Exhibit 3), was in the amount of $3,684.82. It was dated November 27, 1973, and was apparently written to cover goods invoiced from Danube November 5, 1973 (Defendant's Exhibit 3). The second, Check No. 597 (Plaintiff's Exhibit 2), was in the amount of $4,252.54. It was dated December 4, 1973, and was written to cover goods invoiced from Danube on November 15, 1973. The third, Check No. 710 (Plaintiff's Exhibit 1), was in the amount of $5,963.18. It was dated December 11, 1973, and was written in payment of goods invoiced from Danube on November 25, 1973 (Defendant's Exhibit 5), and on November 30, 1973. Each of the three checks was presented for payment to the drawee bank at undetermined times in December, and each was refused.
"On January 1, 1974, the total stock of the corporation was transferred to one Chuck Jackson. Mr. Smith was to receive a consideration of $4,500.00 for his shares; however, this was never paid. The sale was negotiated by Gooch, who arranged for Jackson to purchase the entire interest in Carriage House.
 "CONCLUSIONS OF LAW.
"The defendant, Smith, knew or should have known the financial condition of Carriage House. After the date of December 1, 1973, any expectation of payment of said corporate checks on the part of Smith was unreasonable as a matter of law. The defendant, Smith, was not guilty of active fraud and was not a participant in any knowing scheme to defraud Danube or Southeastern. His conduct amounted to a willful omission to act or gross and willful misfeasance.
 "QUESTIONS TO BE CERTIFIED.
"1. Under the provisions of Title 7, Section 131 (1), Code of Alabama 1940, as amended, does willful misfeasance or willful omission to act amount to an `unlawful' utterance?
"2. Would payment of an antecedent debt sustain a cause of action under the provisions of Title 7, Section 131 (1), Code of Alabama 1940, as amended?
"3. To recover under the provisions of Title 7, Section 131 (1), Code of Alabama 1940, as amended, must plaintiff show detrimental reliance, injury or damage as a result of the action?"
The underlying question before the Court is what must a plaintiff allege to state a cause of action under Alabama's Civil Worthless Check Act, [Act No. 567, Acts of Alabama, 1959, p. 1426, carried as Title 7, § 131 (1), Code of Alabama 1940 (Recomp. 1958)] which provides:
 "Section 1. The holder of a worthless check, draft, or order for the payment of money shall have a right of action *Page 333 
against the person who unlawfully made, uttered, or delivered the same to him or to his endorser. And such action may be maintained though there has been no prosecution or conviction or acquittal of the defendant for his unlawful act. Such action must be brought within one year from the date of the unlawful act. The plaintiff in such action may recover such damages, both punitive and compensatory, including a reasonable attorney fee, as the jury or court trying the case may assess." [Emphasis added.]
All parties admit that the key word in the statute is "unlawfully." By looking to the companion criminal statute [Act 566, Acts of Alabama 1959, p. 1424 and subsequently replaced by Act 2479, Acts of Alabama 1971, p. 3948, carried as Title 14 § 234 (9) et seq.] we can best understand what conduct the Legislature envisioned as constituting the unlawful making, uttering or delivering of a worthless check.
Under the Act making it a crime, to issue a worthless check, there are three elements: (1) drawing the check, (2) with intent to defraud, (3) knowing that there are insufficient funds to cover the check. The Civil Worthless Check Act, by using the word "unlawful," and by allowing a civil action to be maintained regardless of whether a criminal action has been instituted, promotes the private Attorney General concept. Consequently, we feel that the Legislature intended the word "unlawful" to have the same meaning in both statutes. Therefore, in order to present a claim under the Civil Worthless Check Act, the plaintiff must allege that the defendant drew the check, had the intent to defraud, and knew that the check would not be honored. See Tolbert v. State,294 Ala. 738, 321 So.2d 227 (1975), for a discussion of "intent to defraud."
We come now to the first certified question. "Under the provisions of Title 7, § 131 (1), Code of Alabama 1940, as amended, does willful misfeasance or willful omission to act amount to an unlawful utterance?" We answer in the negative. Cf. Jones v. Freeman's Dairy, 283 App. Div. 667, 127 N.Y.S.2d 200, mod. on other grounds, 283 App. Div. 806, 129 N.Y.S.2d 498
(1954). Knowledge that checks are worthless does not necessarily amount to a fraudulent intent, if the checks are given for antecedent debts. Berry v. State, 153 Ga. 169,111 S.E. 669 (1922), Commonwealth v. Hammock, 198 Ky. 785,250 S.W. 85 (1923), State v. Blasi, 64 N.J. 51, 312 A.2d 135 (1973).
"Intent to defraud" requires a scheme to unfairly deprive someone of something of value. There may be instances in which one has the requisite intent to defraud when writing a worthless check for an antecedent debt (i.e. to secure a further extension of credit).
The second certified question has been foreshadowed by our answer to the first question. The second question is: "Would payment of an antecedent debt [by use of a worthless check] sustain a cause of action under the provision of Title 7 § 131 (1), Code of Alabama 1940, as amended?" We hold that it would — provided the check was drawn with "intent to defraud." 32 Am.Jur.2d, False Pretenses, § 78, and Annotation 59 A.L.R.2d 1159, 1163.
The final question is: "To recover under the provision of Title 7 § 131 (1), Code of Alabama 1940, as amended, must plaintiff show detrimental reliance, injury or damages as a result of the action?" We hold that he does not have to make such a showing. The Legislature has created a statutory cause of action allowing recovery against one who has written a worthless check with "intent to defraud." If there is a showing of the requisite "intent to defraud," a plaintiff need not show, though he may desire to, that he relied on the representation to his detriment.
CERTIFIED QUESTIONS ANSWERED.
HEFLIN, C.J., and BLOODWORTH, FAULKNER, JONES, ALMON, SHORES, EMBRY and BEATTY, JJ., concur. *Page 334