HARRIS, Presiding Judge.
Appellant was convicted' of murder in the second degree and the jury fixed his punishment at twenty-five years in the penitentiary. He was represented by counsel of his own choice and at arraignment pleaded not guilty. After sentence was imposed, he gave notice of appeal. He was determined to be indigent and a free transcript was furnished him. Trial counsel was appointed to represent appellant on this appeal.
There was no motion to exclude the State’s evidence and no exceptions were reserved to the oral charge to the jury. Appellant requested the affirmative charge which was refused. A motion for a new trial was filed and the testimony of one of the principal witnesses in the trial in chief was presented in behalf of the appellant. This witness recanted some of the testimony given during the main trial. The trial judge overruled and denied the motion for a new trial, saying:
“The Court is quite impressed with the argument of counsel and I have been seriously considering the testimony of Cynthia Heard. I had read her affidavit prior to the time she testified. However, even with her present testimony, there is still sufficient evidence, though it may be circumstantial, to substantiate a verdict of the jury of murder in the second degree. The Court overrules the motion for a new trial.”
Appellant presents only one issue on this appeal. He alleges reversible error was committed when the trial court excluded evidence of intent or motive when such evidence was tended to rebut malice as an element of the offense.
On a voir dire hearing, prior to the trial, the Court determined that a common-law marriage existed between appellant and Cynthia Heard and the Court advised Cynthia that she could not be' compelled to testify against appellant. Cynthia told the Court that she wished to give testimony in the case.
Cynthia testified that she had known appellant for seven or eight years and they lived together as husband and wife for about three months but they continued to see each other over a period of time and had two children. It was not disputed that appellant was the father of both children. The children lived with appellant in his mother’s home. At the time of the homicide, made the basis of this prosecution Cynthia had not lived with appellant for approximately four years. The children were permitted to visit their mother from time to time and one of them was visiting her on March 29, 1976, the day of the killing. Cynthia was residing with her mother at this time.
On March 29, 1976, the deceased, Jimmie Lee Seawright, came to visit Cynthia. He arrived between 11:00 a. m. and 12:00 noon. Cynthia had known the deceased for about two and a half years. There was no claim that they were married but they had been “staying together” for approximately eighteen months. About thirty minutes after the deceased arrived appellant appeared at the house and knocked on the door. Cynthia’s sister, Amanda, was present at the time and she was talking to her husband on the telephone when she heard the knock on the door. Amanda went to the door and she reported to Cynthia that appellant wanted to see her. Cynthia and the deceased were in the back bedroom and she told him to stay in the back of the house *845 while she talked to appellant. She went into the living room to talk to appellant and he asked her if the deceased was there and she told him no. Appellant told her she was lying and she told him that she didn’t want any mess in her mother’s home. Appellant replied there would be no argument in the house and that he would step outside. Before appellant walked outside he called to the deceased and told him he wanted to talk to him and to come outside.
Appellant walked out on the front porch. At that point the deceased came out of the bedroom and entered the dining room where he sat on the corner of the dining table.
From the record:
“Q. What, if anything, occurred when Jimmy Lee Seawright came out and sat on that table?
“A. Billy told him to come to finish what had started Saturday night and Jimmy told him that if they didn’t finish it Saturday night that he didn’t want to do anything about it. He asked Billy had he went, you know, got something to do something to him with and that is when Billy said he was tired of all of that talking and he just came from the front door to the dining room and he shot him.
“Q. Now when William Mullins, Jr. got to where Jimmy Lee Seawright was and he got there in the dining room what happened?
“A. He had took the pistol out of the archway in the door and then he had shot him — he put the gun to his neck and he shot him.
“Q. Where did he put the gun at?
“A. I think it was on the lefthand side of his neck, right here, (indicating).
“Q. Okay. How many times did he shoot?
“A. Once.”
Cynthia further testified that she did not see the deceased do anything when he was approached by appellant. After the deceased was shot he stated, “This is what you get for being good.” The next time she saw the deceased was at his funeral.
On cross-examination, Heard testified that appellant frequently came to her mother’s house; that appellant had their two children; and, at the time of this incident, their daughter had been staying at the house for a few days. She denied that appellant had come to the house to take the child home with him.
Cynthia further testified that she had borrowed a butcher knife from a woman named Beck a few weeks before this incident, and that she had.not returned it. She stated that when the deceased entered the dining room he did not have anything in his hands. The deceased never moved until he was shot.
Amanda Tarrant testified that she was Cynthia’s sister. She testified to the same events in substantially the same manner as her sister did. She added that appellant told Cynthia that he knew that she was lying about the deceased not being there because his car was out front. Amanda said that appellant asked the deceased if he was scared to come out. When the deceased answered that he was, appellant “ran through the door, ran past me and put the gun up to his neck and said, ‘bitch, I am about tired of your mouth.’ And he shot him.” Amanda never saw the deceased raise his hands, nor did she see a knife in the dining room that day.
Jack Parker testified that he was employed by the Jefferson County Coroner’s Office as a Deputy Coroner. Parker examined the body of a black male identified to him as Jimmy Seawright. He observed a penetrating wound on the left side of the deceased’s neck. Parker stated that he was present when a postmortem examination was conducted upon the deceased’s body. A bullet was located in the right side of the body on the ninth rib. This bullet passed through the lobes of the right lung, and in Parker’s opinion, caused the death of the deceased.
D. L. Higgins testified for the defense and said that he was a Sergeant with the Birmingham Police Department, attached to the Scientific Investigation Bureau. Higgins performed tests on a pistol, which *846 defense counsel stipulated was “the weapon that was used in this alleged incident.” This weapon was introduced into evidence “by agreement.” Among the tests he conducted, Higgins checked the safety functioning features of the weapon. He found that the weapon could be discharged without pulling the trigger by applying a sharp blow to the hammer.
E. J. Jett testified that he was appellant’s uncle and that he owned the gun in evidence. He did not loan this weapon to appellant.
Mary Mullins testified that she was appellant’s mother, and that his children lived with her and her husband.
Rebecca Mitchell testified that Amanda Tarrant’s baby sister borrowed a butcher knife with a nine-inch blade from her in March of 1976. That knife had not been returned. Mitchell further testified that the general reputations for truth and veracity of Amanda Tarrant and Cynthia Heard were not good in the community. On cross-examination, Mitchell stated that she didn’t know what veracity was. Additionally, Mitchell went to the Heard home soon after the deceased had been shot. She did not see a knife in the dining room.
Appellant testified that he had two children; that they lived with him; and that he supported them. On the Saturday before the shooting, the deceased threatened the appellant. Appellant stated that on Sunday he got the weapon in evidence at his grandfather’s house. That day, appellant testified, he went to see Cynthia about his daughter who was visiting there for a few days. Appellant told her he would come back Monday to pick the child up. Appellant did return Monday morning. He stated that he did not know the deceased was there. Appellant told Cynthia that he was there to pick up the baby and Cynthia replied that the child was at the store with “Sunshine.” At that time, appellant stated, he saw the deceased walk into the dining room and .sit on the corner of the table. Appellant continued to talk with Cynthia about the baby.
From the record:
“Q. And what’s the first thing that you heard Seawright say on this occasion, right then and there?
“A. Well, I can’t exactly recall his exact words he said because he was in the other room but he said something about me getting out of the house or asked what I was doing there, something to that effect.
“Q. When he said something about you getting out of the house where did you move to?
“A. When he said that I turned and walked towards him slowly.
******
“Q. And when you walked over there how close did you get to him?
“A. I got about I guess four or five feet from him.
“Q. And what did you say to him and what did he say to you?
“A. I told him, I said, ‘Wait, man, I just come to get my baby, you know, and I don’t think that this is any of your business. You ain’t got nothing to do with this and I don’t even want to talk to you.’
“Q. What did Seawright say?
“A. I don’t recall what he said at that time.
“Q. What did Seawright do?
“A. Well, at that time I noticed he was sitting up on the table and Seawright reached back behind him and grabbed a butcher knife.
******
“Q. Okay, and what did he do relative to that butcher knife?
“A. Well, he grabbed the butcher knife from behind him and reached back and grabbed the butcher knife and he come up with it and he made a lunge towards me.
“Q. When he grabbed the butcher knife was he or was he not on the table?
“A. He was still sitting on the table.
******
“A. He reached back and grabbed the knife off the edge of the table and he came around with it.
*847 “Q. Okay, what did you do at that point?
“A. At this point I stopped and I reached up under my jacket to grab my pistol.
“Q. Did you get it out?
“A. Yes, sir.
“Q. And what did you do with the pistol and what did he do with the knife?
“A. Well, after I originally grabbed my pistol I could see him still coming towards me with the knife in a round motion and I pushed him off with my hand and by that time I had got the pistol out and I raised it up. As I raised it up I reached to swing at him, to strike him, to knock him unconscious to ward off his thrusts and as I swung at him he was still coming towards me with the knife and he threw his hand up and all I know the pistol went off.
“Q. Did you intend to fire that pistol?
“A. No, sir, I did not.
“MR. PICKARD: Object.
“THE COURT: Overrule.
“Q. Did you intentionally pull the trigger of that pistol?
“A. Not to my recollection.”
Appellant denied asking if the deceased was at the house and denied calling him out; and denied putting a gun to the deceased’s throat.
On cross-examination, the State sought to impeach appellant by a prior inconsistent statement given to Sergeant Knight of the Birmingham Police Department. Out of the presence of the jury, appellant testified that he did give a statement to Knight. This statement was given in the presence of appellant’s counsel, after Miranda warnings were read to him. Appellant stated that he was not threatened, coerced, or offered any reward or hope of reward for making the statement.
When the jury returned, appellant testified as follows. From the record:
“Q. Mr. Mullins, do you recall being asked, ‘okay, now if you would, in your own words, tell me what happened when you got there.’ And you responded, ‘well, when I got there around Cynthia and them’s house I seen, you know, Jimmie Seawright’s car around there, the car that he had been driving. I think it was his father’s car.’ Did you make that statement?
“A. I don’t recall.
“Q. Do you deny making it?
“A. I don’t deny it.
“Q. You could have made it?
“A. I could have.”
Further:
“Q. (BY MR. BARBER:) Mr. Mullins, do you recall whether or not during March of 1976, that Jimmie Lee Sea-wright drove a ’64 Chevrolet?
“A. I don’t recall him having a car.
“Q. Do you -recall the statement that we had reference to right before lunch that you gave to Sergeant Knight?
“A. I would say I recall the statement that you pointed out to me.
“Q. Do you recall in that statement telling Sergeant Knight that he drove a ’64 Chevrolet?
“A. I don’t recall that.
“Q. You are not denying that you told him that, are you?
“A. I am not denying it and I am not confirming it. I don’t remember at that time what I told Sergeant Knight. I remember talking to him but at the time I don’t remember exactly what I said to him.
“Q. Let me ask you this, please, sir, if it would refresh your recollection if you read that last question and answer as it appears there? Do you recall being asked, ‘what kind of car is it?’ And you answered, ‘a ’64 Chevrolet.’?
“A. As I said I don’t remember what I said to the Sergeant. I remember talking to him but I don’t remember what I said.”
Following appellant’s testimony, the defense rested. In rebuttal, Cynthia Heard testified that the deceased drove a ’74 or ’75 Impala and that it was parked in front of her mother’s residence on the day of the fatal incident.
*848 During the direct examination of appellant, the following occurred. From the record:
“Q. You went to his house and you got the pistol?
“A. Yes, sir.
“Q. What did you do with it?
“A. When I got the pistol I put it on my person.
“Q. Why?
“A. For my self protection.
“MR. BARBER: Object, and ask that it be excluded, Your Honor.
“THE COURT: This could not come within the purview of Starr v. Starr or Grimes v. State, I would sustain.”
As we have pointed out appellant was permitted to testify that he did not intend to fire the pistol. This can only mean that he did not intend to shoot the deceased.
Appellant contends that such evidence was in rebuttal of the presumption of malice from the use of a deadly weapon, and that such evidence if believed would have possibly reduced the degree of homicide. To exclude the appellant’s answer to this question, appellant argues, was an abuse of discretion by the trial judge. Appellant relies on Starr v. Starr, 293 Ala. 204, 301 So.2d 78.
The well recognized holding of Starr, supra, is that a witness, on direct examination, may testify as to his intention, motive, or other physically unexpressed mental state, provided that such testimony is material to the issues of the case. Thus, a defendant may testify that he did not intend to kill his victim, Grimes v. State, 56 Ala.App. 439, 322 So.2d 729; that he did not intend to injure or defraud the payee of a check which he forged, Tolbert v. State, 56 Ala.App. 269, 321 So.2d 227; Lyles v. State, Ala., 342 So.2d 416.
The materiality of the evidence offered by the holder of this uncommunicated intent is left within the discretion of the trial judge, and the admission or exclusion of such evidence shall not be reviewed upon appeal, except for an abuse of discretion. Starr, supra. In deciding whether or not the trial judge committed an abuse of discretion in the case at bar, it is necessary to determine if the defendant’s evidence of why he had a firearm on this occasion is a “transcendant” issue in the case. Owens v. State, Ala.Cr.App., 340 So.2d 860.
We do not think that it was. The ultimate question in this case for the jury to resolve was, “Did the defendant intentionally kill Jimmy Seawright?” Appellant testified that the shooting was accidental and that he did not intentionally fire the pistol which killed the deceased. Indeed, appellant testified that when he left the house, he did not know that the deceased had been shot. Whatever reason appellant had for carrying this weapon would not answer the ultimate question of whether or not the killing was intentional. If appellant carried a pistol for self-protection, it would not justify an intentional and malicious killing.
The evidence was sufficient to sustain appellant’s conviction for murder in the second degree. The State’s evidence and the testimony of appellant is always a question for the jury to determine, and a verdict rendered thereon will not be disturbed on appeal. Woods v. State, Ala.Cr.App., 344 So.2d 1225; Young v. State, Ala.Cr.App., 346 So.2d 509.
On a motion for a new trial, appellant called Cynthia Heard to testify. She stated that she had contacted appellant’s counsel and wished to change her testimony.
From the record:
“Q. As a matter of fact what did you see occur when the defendant came into the house where you and Seawright were?
“A. I saw him pull the gun. I saw him come through the door and pull the gun. I couldn’t say I saw actual shooting of the gun because he testified he hit him beside the neck. He was standing in front of me so I can’t say whether he hit him beside the neck or did he point the gun directly at him because I can’t say I saw it.”
*849 In reviewing a refusal of motion for a new trial, the Court of Criminal Appeals will indulge every presumption in favor of correctness of the ruling of the trial judge. Young v. State, supra. The preponderance of the evidence against the verdict is not so decided as to clearly convince this Court that it was wrong and unjust.
A thorough search of the record reflects no error injuriously affecting the substantial rights of appellant. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.