LEIGH M. CLARK, Retired Circuit Judge.
A jury found defendant guilty under an indictment charging in pertinent part that he:
“with intent to defraud did make, draw, utter or deliver a check, draft or order for the payment of money upon the Bank of Fyffe, Fyffe, Alabama, knowing at the time of such making, drawing, uttering or delivery that the maker or draft drawer did not have sufficient funds in, or credit with such bank for the payment in full of such check, draft or order, upon its due presentation, and with such intent to defraud, did procure an article, or thing of value, to-wit: 1973 Volkswagen automobile, of the value of $925.00, . . . . ”
The jury fixed defendant’s punishment at a fine of $925.00. The court added to his punishment imprisonment in the penitentiary for one year and sentenced defendant accordingly.
Except in one particular that will be discussed hereafter, the indictment charges a crime constituting a violation of Section 4 of Act No. 2479 of the statutorily named Alabama Worthless Check Act, which section is now codified as Code 1975, § 13 — 4— 113, which provides:
“It shall be unlawful for any person to draw a check, or to cause or direct the drawing of a check, with intent to defraud, on any depository, knowing at the time of the drawing of such check that the maker, drawer or payer thereof does not have sufficient funds on deposit in or enough credit with the depository for the payment in full of such check and all *228 other checks upon such fund or credit then outstanding. This section shall also apply to, but not be limited to, postdated check where the person drawing the postdated check, or causing such to be drawn, does not notify the payee that the check is postdated or make an arrangement with the payee to hold check.”
Code § 13 — 4-122 states that a person violating Section 4, as well as some other sections, of the Act “shall be punished upon conviction . . . When the check is for $500.00 or more, a fine of not less than $500.00 nor more than $5,000.00 and/or imprisonment not to exceed three years.”
Appellant insists that by reason of the punishment of imprisonment for one year defendant was convicted of a misdemeanor and not a felony. If this were true, the prosecution according to the undisputed facts and Code 1975, § 15-3-2, was barred by the statute of limitations of twelve months.
Code 1975, § 15-18-l(b) provides:
“In all cases in which the imprisonment or sentence to hard labor is 12 months or less, the party must be sentenced to imprisonment in the county jail or to hard labor for the county. No misdemeanor prisoner may be sentenced to the penitentiary.”
Appellant is mistaken as to the dividing line in Alabama between felonies and misdemeanors. It is not whether the one convicted of a particular crime must be punished by death or imprisonment in the penitentiary, but whether such person may be punished by death or imprisonment in the penitentiary; it is not whether the crime is punished, but whether the crime is punishable, by death or imprisonment in the penitentiary. Lashley v. State, 236 Ala. 1, 180 So. 717 (1938); Jackson v. State, 37 Ala.App. 335, 68 So.2d 850 (1953).
“A felony, within the meaning of this Code, is a public offense which may be punished by death or by imprisonment in the penitentiary; all other public offenses are called misdemeanors.” Code 1975, § 1-1-7.
No contention is made that to comply with Code § 15 — 18-1 imprisonment should have been in the county jail instead of in the penitentiary, as the period was not “for more than 12 months” or one year. As to any discrepancy in this respect, we need take no action in view of our disposition of this case as shown hereafter.
Another insistence on a reversal is that “the prosecution of the Appellant was an unconstitutional application of the Alabama Worthless Check Act as applied against him in that the prosecution was brought for the sole purpose of collecting a civil debt.” As to this question we are greatly aided by Tolbert v. State, 294 Ala. 738, 321 So.2d 227 (1975) and Harris v. State, Ala.Cr.App., 378 So.2d 257 (1979), but we think it best to withhold further discussion thereof until after we discuss the equally important question: Under the undisputed evidence and the applicable law, was a jury question presented as to defendant’s guilt? We now consider such question irrespective of the fact that it is not directly raised on appeal.
The check described in the indictment was signed and issued by the defendant on May 17, 1978, at the Midfield Car Auction at Midfield in Jefferson County. It was made payable to J. J. Moore, to whom the check was delivered at the time in payment in full of the purchase price of an automobile that Mr. Moore sold and delivered at the time to defendant. The check was received and dishonored by the drawee bank on May 23, 1978, for the stated reason, “Insufficient Funds,” and returned through banking channels to Mr. Moore, the payee. Mr. Moore then called upon Mr. James Prestwood as representative of the Midfield Auto Auction to pay Mr. Moore the full face amount of the check, which Mr. Prest-wood did in accordance with the agreement between Midfield Car Auction and sellers of automobiles under the auspices of the auction company.
A large part, if not most, of the evidence in the case pertained to discussions between the defendant and Mr. Prestwood and efforts or purported efforts by the defendant to pay the amount of the check to Midfield *229 Car Auction. Most of that evidence, though relevant to the issue of whether the prosecution was for the collection of a debt has little bearing, if any, on defendant’s guilt or innocence, which we are now considering.
The defendant lived at Rainsville, Alabama, and conducted a used automobile place of business there, a distance of between five and ten miles from Fyffe. His account at the bank was in the name of King’s Body Shop. The records of the bank as to the account were brought to the court by Mrs. Sue Gray, the assistant vice president and cashier of the bank. Pertinent copies of the records were introduced in evidence. The records include “checking account statements” for each month beginning January 20, 1978, and ending August 21, 1978. The statements show the amount of the “checks and other debits,” the amount of “deposits and credits” and the amount of the “balance” for each of the intervening days for which there were any “cheeks and other debits” or “deposits and credits” posted on the statements. The statements show that on May 16, 1978, there was a balance of $30.06, that on May 18, 1978, the balance was $15.06 and that nothing was posted on May 17, 1978. According to the statement, there had been total deposits and credits of $7,450.00 and total checks and other debits of $7,323.90 between May 18, 1978, and June 20, 1978, both inclusive, and that the highest balance on the days posted during that period was $214.16. However, between January 20, and April 29, the daily balance would be more than one thousand dollars more than it would be less than that amount, the highest amount thereof being $5,110.51 on March 10, and the next highest $4,440.77 on April 1, and that the balances on April 27, 28 and 29, were respectively $1,429.53; $1,039.65 and $1,489.65.
The defendant testified that he did not “fill out” his deposit slips, that the bank tellers did so. He testified that on April 8, 1978, he made a deposit in the amount of $3,490.00 and exhibited a deposit slip, initialed by a purported teller, for the amount of $3,490.00 with a notation thereon “sent for collection.” He introduced in evidence a page of his deposit book with the legend therein “APR 8 1978 3,490.00,” which is apparently initialed with the same initials of the teller on the deposit slip of April 8, 1978.
Much of the testimony and argument on trial pertained to the apparent discrepancy between the checking account statement, which does not reflect a deposit of $3,490.00, or any amount within the range thereof, on or about April 8, 1978, and a reflection thereof in defendant’s deposit book as well as on the deposit slip of that date, on the other hand. It seems that it is clear to the bank and to Mrs. Gray that the amount of $3,490.00 represented two drafts, which, as the deposit slip indicates, were “for collection” and that the same were never collected and for that good reason were never credited to defendant’s account. We are not disposed to doubt that, and likely the jury did not doubt it, and for like reason we are not persuaded that defendant is correct in his testimony to the opposite effect. In other words, the jury was justified, in our opinion, in believing that defendant did “not have sufficient funds on deposit in the bank for payment of the check set forth in the indictment” at the time or about the time it was drawn. This, however, is not a vital issue between the parties in this case as it would be in a civil suit between this defendant and the bank. The vital issue then would be whether on the one hand the bank is right or whether on the other hand Mr. King is right. Nevertheless, in the instant case, a vital issue is whether Mr. King thinks he is right. There can be no valid conviction unless defendant drew the check “with intent to defraud . . . knowing at the time” that he did “not have sufficient funds on deposit ... for the payment in full of such check and all other checks upon such funds or credit then outstanding.” Code § 13 — 4-113. There is no contention that there were checks outstanding of a sufficient amount which, when added to the amount of the check given to Mr. Moore, would exceed the sum of $3,490.00.
*230 To be added to what we have said is the undisputed evidence that the mentioned discrepancy between the records in the possession of the defendant initialed by a representative of the bank and the records in the possession of the bank was never explained to defendant until long after the check to Mr. Moore had been dishonored and then returned to Mr. Moore by reason of “Insufficient Funds.” As to this, the defendant testified in part on cross-examination:
“Q. And your attorney has asked you a lot of questions about this $3,490.00 that was deposited — receipt you got during April 8 of ’78. That was a month before you wrote the check, right?
“A. Right.
“Q. And you heard Mrs. Gray, the lady from the bank, say when she gave you this you came in asking questions about this? And you heard her testify that she explained that that amount represented these two drafts?
“A. Correct.
“Q. Do you remember that?
“A. Yes, sir.
“Q. In other words, they sent these drafts off both on the same day, 4-10-78. One was $1,370.00 and one was $2,120.00. So, that was $3,490.00, is that correct?
“A. Correct.
“Q. So, are you testifying that you made an additional $3,490.00 deposit? Is that what you are up here saying?
“A. That is correct.
“Q. Then, what was that additional $3,490.00?
“A. According to my books I had made an additional $3,490.00.
“Q. Do you have your books here?
“A. Yes, sir.
“Q. Can you show me that additional receipt? In other words, my question is this? You heard her say that they made a receipt when they didn’t normally make — they made a receipt in your book for $3,490.00. And you heard her testify you came in and talked about it and she told you that receipt represented those two drafts?
“A. But, when I went in to talk to her was at least two months when I kept coming up short.
“Q. And did they—
“A. They ran the books. They tried to explain it to me. I researched what she said was in it and it was not. My sister, Public Accountant, she has worked on it and worked on it.
“Q. Let me ask you this, you saw Mrs. Gray come in with all the records and they are all computerized. Can you explain why that $3,490.00 is not on there? “A. No, sir, I can’t.”
The remainder of the cross-examination of the defendant was largely repetitious of what has been quoted above, as to which defendant was persistent in his views. On redirect-examination he testified in part:
“Q. All right. When you have a draft that is deposited and it is made good, do they send that draft back to you? Does the bank send that draft back to you?
“A. No, sir.
“Q. So, you wouldn’t have any reason to have those checks here today, would you?
“A. No, sir.
“Q. Now, there has been a lot of talk about your — about Mrs. Gray’s explanation to you at the bank. Were you satisfied with the explanation they gave you?
“A. No, sir. I went over and asked my sister to do research on it. I wouldn’t have liked so many long distance phone calls trying to chase all of it down.
“Q. All right, sir. I’m going to ask you again, was it ever your intention to defraud Midfield Car Auction out of any money or any automobile?
“A. No, sir. No sir, I dealt with Midfield Auto Auction off and on for twelve or fourteen years. I never beat them out of a penny. Mr. Prestwood will tell you that.”
Testimony in the case .ended with the following recross-examination of the defendant:
“Q. Just one question. Is your sister here today?
“A. No. She could have been if we had needed her.”
*231 Although the testimony of the defendant is not to be taken without due regard for his interest in the outcome of the case, there is much substance in his contention that there was a bona fide dispute between him and the bank as to the sufficiency of funds in the bank to pay the check. There is other evidence that has a material bearing upon the question of his fraudulent intent, which is a material averment of the indictment and of the statute upon which the indictment is based. At the request of the defendant, the court instructed the jury as follows:
“I charge you that no person may be found guilty of drawing a check issued without sufficient funds if you find from the evidence that the Defendant had such credit with the said Bank of Fyffe as to lead him to believe and have a bona fide belief and reasonable belief that the check will be honored by way of overdraft. This line of credit may include an implied understanding on the part of the Defendant from the past course of dealing with the Bank of Fyffe and the course of conduct of the Bank in the past with the Defendant.”
The charge given is substantially in the language of the charge that was requested by defendant but refused by the court in Harris v. State, supra. It was held therein that the refusal of the charge constituted reversible error. In so holding, reliance was placed upon Elliott v. Caheen Brothers, 228 Ala. 432, 153 So. 613 (1934). It was said in Harris v. State at 378 So.2d 261:
“Under the authority of Elliott, therefore, it would seem that the past course of dealing between appellant and the drawee bank (i. e., that the bank had always called appellant and allowed him the opportunity to cover his checks and that none of his checks had previously been returned) constituted credit within the meaning of the statute, and that this evidence was sufficient to rebuff the intent to defraud on the part of the appellant.”
In the defendant’s testimony herein, he said:
“Q. All right, sir. Now, Mr. King, did the bank ever pay any of your overdrafts?
“A. Yes, sir.
“Q. And how many did they pay?
“A. I couldn’t tell you the exact amount but several.
“Q. Well, did they ever refuse to pay a check other than this particular one?
“A. Not that I know of.
“Q. Not that you know of. This is the only check you had they refused for insufficient funds?
“A. Yes, sir.
“Q. Up until May 17, 1978, is that correct?
“A. Yes, sir. We did have some checks from Mr. Prestwood that we had trouble with but we did make those correct.
“Q. You did make those right?
“A. Yes, sir.”
Although the representative of the bank, who testified on call of the State, when first questioned about payment by the bank of any overdrafts of the defendant, said at first, “I don’t believe we did,” he promptly qualified that statement and thereafter verified twenty printed and typed vouchers of the bank to the defendant commencing on February 27, 1978, and ending on May 11, 1978, showing that defendant’s account had been charged $5.00 for a check which the bank had paid in a stated amount resulting “in an overdraft balance” on defendant’s account. The first voucher contained the following, “We have today charged your account $5.00 and paid your check in the amount of $3,000.00 which resulted in an overdraft balance on your account.” The witness testified that “a lot of times we pay them if we know they have made a deposit that day.” In going over the documents showing payments of overdrafts, she recited:
“A. Okay. 2-27-78. We paid $3,000.00 check. 3-16-78 we paid a fourteen hundred dollar check. A check for — 3-10-78, we paid $69.95. Date 3-9-78, we paid a $4,000.00 check.
“Date 3-9-78, we paid a $75.00 check. 3-9-78 we paid a $3,600.00 check. Date 3-9-78 we paid a $100.00 check.
*232 “Date 3-9-78, we paid a $95.27 check. Date 3-23-78 we paid a $300.55 check. Date of 3-23-78, a $350.00 check.
“Date 4-3-78 we paid an $80.00 check. Date 5-1-78 we paid a $68.00 check. Date 5-11-78, we paid a $100.00 check. Date 5-4-78 we paid a $850.00 check.
“Date 5-11-78 we paid a $120.00 check.
“Date 5 — 18—78 we paid an $1,820.00 check.

“Q. Go ahead.
“A. Check No. — Date 5-18 — 78, we paid $175.00 check. Date 5 — 18-78, we paid a $39.00 check. Date 5-18 we paid a $30.00 check. Date 5-11-78 we paid a $54.47 check, Date 5-11 we paid a $55.68 check. Date 5 — 11—78 we paid $140.00. 6-2-78 we paid a $160.00 check.”
It is obvious from the evidence as a whole that appellant was grossly, habitually and censurably lax. However, the repetitive conduct of the bank in honoring his overdrafts, except in the instance directly involved in this case, tends strongly to confirm the position of defendant, as expressed in his testimony, that he had no intention to defraud. Upon a consideration of all the evidence, including the “prima facie evidence of intent to defraud,” etc.,[1] we doubt that the State met the burden of proof imposed upon it to show that the drawing of the check by defendant was “with intent to defraud” and with the requisite knowledge of the insufficiency of funds, or credit with the bank, for the payment in full of the check, as alleged in the indictment, and as required by Code of Ala.1975, § 13-4-113. However, it appears that the question of the insufficiency of the evidence was not raised by defendant on the trial and is not raised on appeal, though it was raised in a limited way in defendant’s motion for a new trial; for that reason and because of our conclusion as to the proposition next considered, we make no determination at this time as to whether the judgment should be reversed because of any insufficiency of the evidence.
We now turn to the question whether the prosecution in this case was an unconstitutional application against him of the Alabama Worthless Check Act in that the prosecution was for the purpose of collecting a civil debt. If so, the case should have been dismissed on motion of defendant when the State rested its case.[2]
According to the testimony of Mr. James Prestwood, he was the manager of Midfield Car Auction, Inc., during all of the time between the day the check was drawn and the trial of the case. He described his duties as, “Well, I handle credit, credit collection.” He did not have a clear recollection of all that occurred with reference to the check after the time Mr. Moore, the payee, delivered it to Mr. Prestwood for payment thereof in accordance with the guaranty, but he did write defendant on August 30, 1978, a certified letter, which was returned to Mr. Prestwood without delivery to Mr. King, in which Mr. Prestwood said:
“Your check # 367 for 73VW has been returned to me for insufficient funds.
“This must be paid at once or legal action will be taken.
“Also you still owe me a balance of $180 on your other checks.
“Please contact me at once on this.”
*233 He further said that he saw defendant on June 5, 1979, and that he swore out a warrant for defendant on that day. He also testified:
“Q. So, you didn’t see him until the next following June 5?
“A. I may have seen him in the meantime, but as to specific dates, this is the only date I can pin down.
“Q. So, you remember specifically on June 5 seeing him in Court?
“A. Yes.
“Q. Now, let me ask you this: In between the time you sent that letter and the time you saw him in Court on June 5, had he made any payments to you?
“A. He had on other checks.
“Q. Well, we are just here about this particular check.
“A. No.
“Q. Had he returned the car to you?
“A. No.
“Q. Now, when you did him on June 5, the following June 5th of ’79, what if anything did you say to him then; do you recall?
“A. Yes I told him we still had this $925.00 check outstanding.
“Q. Do you remember what he said?
“A. Not exactly.
“Q. Well, not the exact words, but anything he said?
“A. He would try to take care of it.
“Q. What happened then?
“A. On August 30th of ’79, I received $100.00 from him.

“Q. Now, I want to ask you, and I want you to stop and think about the times that you saw him after the check was written. And, ask you if you recall any statements he made to you about paying the check.
“A. He made statements he would pay it.

“Q. Did this occur several times?
“A. Yes, sir, it had to.

“Q. Did he ever give you an explanation why the check was not paid?
“A. Nothing but he was short of money.
“Q. He was short of money?
“A. Yes. He would try to pay.”
On cross-examination, Mr. Prestwood testified in part:
“Q. And the reason you are here today is so you can collect your money; is that right?
“A. No, sir, I’m here to prosecute him. I don’t have my money.
“Q. Well you have used this threat of prósecution as an attempt to collect a debt; haven’t you?
“A. No, sir.”
Defendant’s Exhibit 2, which Mr. Prest-wood acknowledged that he wrote defendant, was introduced in evidence. It states:
“Dear Elbert,
“This is the only payment I have received from you so far. This will leave you 2 more payments due by September 5,1979.
“Let me hear from you on this.
“Sincerely yours,
“James A. Prestwood.”
When the letter was shown him, the witness continued:
“Q. And so, apparently you did have some payment plans worked out with Mr. King at this time?
“A. Yes.
“Q. And that is to pay off this check?
“A. (Witness nods head.)
“Q. So, you had an oral agreement with Mr. King to pay off this debt, is that correct?
“A. True.

“Q. .. . And you had an oral agreement with him to pay off the existing debt with the $925.00, is that correct?
“A. We had a promise from him to pay.

“Q. And you accepted that promise, didn’t you, upon the condition he pay?
“A. Upon the condition he pay.

*234 “Q. You stated you swore the warrant out on the 5th of June? Do you remember when you entered into the agreement for payment of the check?
“A. It would be about the same time.
“Q. On the 5th of June, the date you swore the warrant?
“A. Probably, I’m not sure.”
Defendant’s testimony was about as vague as Mr. Prestwood’s relative to conversations between the two as to any understanding between them as to what he could or would do as to the unpaid check. There apparently is some conflict between them as to their understanding of any agreement between them, but there is little conflict as to what was said between them. It is reasonably clear that about the same time, or soon after, the check to Mr. Moore was turned down by the bank, two or more checks totaling $180.00 of defendant were turned down by the bank, that they were held by Midfield Car Auction and that defendant made payment of them to Mr. Prestwood. The two seemed to agree that on the day Mr. Prestwood swore out the warrant for defendant as to the Moore check, they were both in court in connection with the other checks. The Case Action Summary in this case shows that the war-, rant was issued on June 5,1979, and that on the same day defendant was released on bond. The indictment was returned on August 15, 1979. The same Case Action Summary shows that on September 4, 1979, the case was “passed to be reset” and that on October 18, 1979, “defendant failing to appear this date duly set for trial,” a forfeiture on his bond was taken, that appropriate writs were issued, that on October 26, 1979, defendant was placed in jail in De-Kalb County, that on the following day he made bond and that on December 6, 1979, “Defendant having made bond case is passed to be reset.” He was arraigned on January 7, 1980, tried and convicted on June 16, 1980, and sentenced at a hearing conducted on September 3, 1980.
As to what occurred between defendant and Mr. Prestwood on June 5, 1979, defendant testified:
“Q. And he testified about a certain agreement you and he had entered into on June 5th, 1979?
“A. That is correct.
“Q. Would you tell the jury, please sir, just what was — what happened or what was said between you and Mr. Prestwood at that time?
“A. Well, I still owed him a balance of $180 on some cashier’s check I had sent him.
“When he notified me I sent him cashier’s checks right back in the mail. And I paid him the balance on that. And he told me I could pay the other however I could the best way I could. I told him I would try to pay him a little every month for two months however I could.
“Q. Did you know at the time you made the agreement to pay it off he had issued a warrant for your arrest?
“A. No, sir, I didn’t.
“Q. When did you first learn of the warrant being issued for your arrest?
“A. Well, he said I would have to sign a bond. It would be our agreement and I could sign my own bond. So, I sent him a couple of payments. And I got a letter from him stating that he got my payments. And in a few days I- got picked up and put in jail. Said I hadn’t appeared in court. And I hadn’t gotten any appearance notice. I didn’t know I was supposed to.
“I thought me and him had got it settled. So, I stayed up in jail about three days and nights, I think. And I got out and I called down here to the court and talked to Judge Reynolds, and made an appointment to come down. And they had forfeited my bond. And I come down and got a new date with him and he appointed you as my lawyer.
“Q. Now, Mr. King, did Mr. Prestwood ever tell you that if you paid the check he would drop the charges?
“MR. SCHILLECI: I object to that.
“THE COURT: Overruled.
“A. Yes, sir.
“MR. SCHILLECI: Self-serving.
“THE COURT: Overruled.
*235 “(By Mr. Robinson:) He did?
“A. Yes, sir.
“Q. What date was this?
“A. The date we made the agreement.
“Q. The date you made the agreement here in the courthouse?
“A. Yes. I paid him $180.00.”
We do not doubt that some of the uncertainty, vagueness and conflict in the testimony of Mr. Prestwood and the defendant as to what occurred relative to the check and any efforts on the part of defendant to straighten the matter out was to a substantial extent by reason of the interval of time of more than two years between the issuance of the check and their testimony. We are also convinced that the confusion was worsened by reason of defendant’s delinquency as to two other checks held by Midfield Car Auction as to which there was a settlement between defendant and Mr. Prestwood. The record is not clear as to whether there were ever any criminal proceedings relative to such checks; but it may be significant that on June 5, 1979, when Mr. Prestwood swore out the warrant for defendant in this case, which defendant says he did not know was sworn out at the time, it appears that defendant was released on his own bond in the amount of $500.00, and that the two men were at the courthouse at the time.
We now mention an item, which has not been discussed by the parties, but which we think has considerable significance in connection with the question whether the Worthless Check Act was unconstitutionally applied in an effort to collect a civil debt. It is a stamped statement on the back of the check that furnishes a basis for the prosecution of this case, though it is partly obscured or obliterated by other stamped material thereon and a punched out portion of the check. It is as follows:
“This Instrument Guaranteed By Mid Car Auction, Inc., Under the Term[3] Its Policies. We Are Not Responsible For Stopped Payment Checks.
“Signed, flnitials or name illegible!”
We consider this item in connection with the following provision of the Alabama Worthless Check Act:
“It shall be the duty of the drawee of any check before refusing to pay the same to the holder thereof upon presentation, to cause to be written, printed or stamped in plain language thereon or attached thereto the reason for the drawee’s dishonor or refusal to pay the check. In all prosecutions under this division, the introduction in evidence of any unpaid and dishonored check, having the drawee’s refusal to pay stamped or written thereon shall be pri-ma facie evidence of the drawing of said check and the dishonor thereof and that the same was properly dishonored for the reasons written, stamped or attached by the drawee on such dishonored check.” Code of Ala. § 13-4-119.
Although the right of Midfield Car Auction, Inc., to the check and the chose in action based thereon is unquestionable and has never been questioned by defendant, it seems that the guaranty of such transactions by Midfield was deliberately limited to such an extent that it would not become liable on its guaranty unless it had the benefit of the last quoted provision of the Alabama Worthless Check Act, or, stated otherwise, it would have the benefit of all of the provisions of the Alabama Worthless Cheek Act. That it had the right to protect itself is not questioned, but the possible intention of the limitation to enable the guarantor to utilize a criminal proceeding, or the threat thereof, to obtain satisfaction, is not to be ignored in connection with the question now under consideration.
We have no doubt that appellant would never have been prosecuted if no one acting in a representative capacity for Midfield Car Auction had ever sworn out a warrant for the arrest of the defendant. We are persuaded that this was postponed for more than a year because of the belief *236 the check would be paid by defendant without the necessity for a criminal prosecution, that, if it had been paid before June 5,1979, no criminal prosecution would have ever been instituted and that, if it had been paid in full by defendant before the testimony of Mr. Prestwood was taken, Midfield Car Auction, Inc., and Mr. Prestwood would have had no further interest in the prosecution.
We adopt and apply the language of Presiding Judge Harris at the end of the opinion in Harris v. State, supra:
“We are clear to the conclusion that this prosecution was instituted for the collection of a civil debt and that the conviction was wrong and unjust. To allow this conviction to stand would be a travesty on justice.”
The judgment of conviction should be reversed and the appellant should be discharged.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment of the trial court is reversed and a judgment is here rendered discharging the appellant.
REVERSED AND RENDERED.
All the Judges concur.

. “As against the person drawing the check, or the person causing or directing the drawing of the check, the drawing of such check, payment of which is refused by the depository, shall be prima facie evidence of intent to defraud and of knowledge of insufficient funds in or credit with such depository; provided, that such person has not paid the holder of the check the amount due thereon within ten days after receiving notice that payment of such check was refused by the depository....” Code of Ala., 1975, § 13-4-118.

. The court took the motion under advisement at that time. We fail to find a definite ruling thereon during the trial. However, a motion for a new trial was duly presented in which the same contention of appellant was made. The motion for a new trial was overruled. We believe, and there is no contention to the contrary, that defendant preserved this particular point to the extent that it can now be properly reviewed.

. A space of approximately 3-5 letters is punched out of the end of the first three lines of the statement.