John C. Bullen was indicted in November of 1984 on 38 counts of theft of property (30 counts of theft in the first degree and eight counts of theft in the second degree). The appellant stood trial on these charges in July of 1985 but a mistrial was declared because of a hung jury.
Following this trial, ten of the counts were dismissed by the trial court (six counts of theft in the first degree and four counts of theft in the second degree). The appellant was tried on the remaining 28 counts in February of 1986. The jury found the appellant guilty on all 28 charges. The trial judge imposed six sentences of one hundred forty-nine (149) months' imprisonment (each of those sentences to run concurrently), 18 sentences of sixty (60) months' (each of those sentences to run concurrently with each other but consecutively with the 149 month sentence) and four sentences of thirty-one (31) months (each of those sentences to run concurrently with each other but consecutively with the 149 and 60 month sentences). The appellant's sentences totalled 240 months or 20 years. The trial judge also ordered the appellant to make restitution in the amount of $261,441.
In the fall of 1983, the 28 prosecuting witnesses each took their crop of soybeans to Redmont Grain, Inc (hereinafter referred to as Redmont). Redmont was owned and operated by this appellant. Some of the beans which the farmers brought to Redmont were sold at the time of delivery. The farmers would then receive cash representing the market price of the soybeans on that day multiplied by the number of bushels sold. The rest of the beans were left at Redmont to be sold at a later time.
The price of soybeans on the commodities market was always low at harvest time because of the glut of soybeans at that point in time. The farmers would leave their soybeans at Redmont on a "price later" basis, hoping that they could obtain a better price for their beans later in the year when the price of soybeans rose.
When the farmers left their soybeans at Redmont, they received a weight ticket indicating the quantity of beans the farmers left at Redmont. Although the various terms "store," "delay price," and "open *Page 229 
storage" were printed on the tickets, all of the farmers stated that they left their beans to be stored. Some of the farmers testified that the appellant or his manager at Redmont told them they were to be charged a storage fee of four cents a bushel per month. However, all of the weight tickets which were introduced into evidence indicated that there was no storage fee.
Most of the farmers testified that they knew the appellant was in the business of buying and selling grain, and they realized that their particular beans might not remain in the grain elevator until they were ready to sell. However, the farmers stated that they thought the appellant would retain at Redmont an amount of beans equal to the quantity they had stored there.
In the spring of 1984, the appellant and Redmont declared bankruptcy. At this time, no beans remained in the bins at Redmont. Most of the farmers testified that they had never given the appellant permission to sell their beans. A few farmers had given the appellant permission to sell their beans several weeks immediately preceding the bankruptcy. However, when these farmers received a check for their beans, the check "bounced," and they learned that their beans had already been sold at the time they gave permission to sell.
After bankruptcy was declared, the farmers went and talked to the appellant. The appellant told the farmers that the beans were gone and he had no money. He said he was going to sell all his property and he would pay them for their beans plus 14 percent interest.
All of the farmers had filed a claim in the bankruptcy proceedings, and, also, each had joined in filing a civil suit against this appellant. Some of the farmers testified that the criminal charges were filed as a means to obtain their money. Some testified that they would not have filed the charges if they had been paid for their beans. Most stated that all they wanted was their money. Many of the farmers testified that they had stored grain at Redmont in the past and had always been paid for their beans when they were sold.
Joe Tucker, a certified public accountant, testified that he examined the checks and deposits of Redmont for the years 1981 through 1984. These documents revealed that the appellant had taken $384,000 more dollars out of Redmont than he put into it. Tucker stated that there were several entries in Redmont's journal which he did not use in his tabulation because he had no supporting documents for these entries. These include: $130,000 for new grain bins which were built by the appellant; $107,000 for bank notes which were paid for by the appellant; $7,500 in posting errors; $125,000 for the transfer of a feed mill to Redmont from the appellant; and $76,000 in deposits made after the bankruptcy. Tucker also did not include any monies the appellant may have put into the business when it was started. Tucker admitted that, if he had considered the above figures, the appellant would have put more dollars into the business than he took out.
Tucker further testified that there was a difference of $200,000 between the amount that the appellant paid to Dean Witter Reynolds over the amount which he was paid by them. He stated there was a large deficit between the storage payable and Redmont inventory, and the Dean Witter Reynolds account. However, Tucker stated there were no irregularities found in the books which were kept by Redmont's bookkeeper.
Ronnie Brown was the manager of Redmont during the years it was in business and he testified to the operating procedures at Redmont. The farmers would come to Redmont with a load of beans and Brown would grade and weigh the beans. If the farmer wanted to sell his beans right then, Brown would give the farmer a check. If the farmer wanted to sell his beans later, Brown would give the farmer a scale or weight ticket.
Brown stated Redmont was never successful in charging for storage. Storage fees were only charged on a few occasions out of several thousand transactions.
When the beans were left at Redmont, they were placed in grain bins. Redmont originally had two grain bins, and two more *Page 230 
were built in the summer of 1981. The total capacity of the grain elevator was 200,000 bushels. The bins would fill up at harvest time and the beans would be moved out gradually during the rest of the year. The beans with a high moisture content deteriorated rapidly and had to be moved first.
When the appellant wished to sell beans, they were usually sold and transferred to Bunge Corporation in Decatur, Alabama. The appellant would then buy a number of bushels of beans on the futures market equal to those he sold to Bunge. The use of a hedge locks in the elevator operators' profit. If the price of the beans went up, the appellant would gain on the futures market but would lose an equal amount on the cash sale at the time when the farmers priced his beans. The opposite was true if the price of beans went down. The use of a hedge account protects farmers and grain elevator operators from market fluctuations and it is a legitimate business practice in the grain elevator trade. Although the farmers' beans were not in the bin when Redmont traded in the futures market, they had a right to that same quantity of beans on the futures market. Brown stated that the money which the appellant earned in the futures market was used in the operating account of the business. When Brown wrote checks on the operating account, the checks were covered by a draw note from the bank if there were insufficient funds in the operating account.
In late 1983 or early 1984, the bank cut back on the line of credit on Redmont's operating accounts, and the appellant had to use his own funds to replace those which were lost when the bank reduced the line of credit. Brown testified that checks were written back and forth between Redmont and the appellant's other business to cover temporary financial emergencies. The appellant operated a hedge account until early 1984.
When a farmer came in and wished to price the beans he had left at Redmont, the price was indicated on a board at Redmont. The starting point for determining what price Redmont would pay the farmers was the price on the Chicago Board of Trade. On this date, the price was adjusted locally by determining what the processors would pay Redmont for the beans. Redmont figured in a 25 cent per bushel profit to determine its final price.
Brown testified that Redmont's warehouse license expired in July of 1983.
Redmont's application for a license was in for the next year and they were waiting for bond approval. When Redmont learned that it was not going to be licensed for that year (i.e. 1983-84), and, thus, could only operate on a cash basis, Redmont quit taking in beans. Brown stated there was always a delay in getting a new license after the expiration of an old one because bond approval always depended on the financial statement.
Brown testified that there was never any agreement with the farmers to keep an equivalent amount of their beans at Redmont. If the farmers understood differently, it was their misunderstanding. Brown also stated that there was never any attempt to deceive the farmers that their beans were being sold to processors.
Brown testified that the appellant never took money from Redmont for his personal use. The appellant also never received a salary from Redmont.
Jack Theison, a District Manager for Bunge Corporation, testified that his company buys soybeans from area grain dealers and processes them into meal and oil. He testified about the deliveries of beans from Redmont to Bunge from August of 1983 to March of 1984.
Theison also testified about the various terms used in the elevator business.
Open storage occurs when the farmer delivers grain to the elevator for future disposition. The grain is to be held until the farmer sells the grain or takes it back. A storage fee is usually charged. Delayed pricing occurs when the farmer delivers his grain to the elevator and title is transferred to the elevator at that point. No storage fee is charged in this situation. The elevator then sells the beans and buys an equal amount on the futures market. *Page 231 
A warehouse receipt is issued when a farmer wants to store his grain. A warehouse receipt is the only time there is a written guarantee that the elevator operator will maintain the amount of beans on site that the farmer delivered. None of the receipts or tickets in this case were warehouse receipts.
Virginia Gaddis, Redmont's bookkeeper, testified for the defense.
Gaddis kept Redmont's books from the time it started business until it declared bankruptcy. She stated, that when she made adjusting entries in Redmont's journal, she always had supporting documents. Gaddis said that the appellant never drew a salary from Redmont and she did not see any evidence that the appellant was draining Redmont's assets.
Kermit Jones prepared the income tax returns for the appellant and Redmont, and, also, Redmont's financial statement. He said that there were never any problems with Redmont's books and adjusting entries was a standard practice. Jones never saw any evidence that the appellant "doctored" the books.
Jones testified that you could not get an adequate view of what the appellant put in and took out of the business from merely reviewing checks and deposits. In his estimate, the appellant lost money on Redmont.
Several farmers testified that they brought beans into Redmont to store. They stated that "delay price," "price later," "hold," and "store" meant the same thing. The appellant never told them that a number of beans equal to what they delivered would be maintained on the site. The farmers were just looking to get paid for their beans.
The farmers also said that they engaged in futures contracts with the appellant whereby the appellant would agree to pay them a price for the future delivery of their beans. They stated this was a hedge from the farmers' standpoint because they locked in their profit.
Bobby Malone runs a grain supply business in Russelville, Alabama. He testified that a grain dealer does not have to issue warehouse receipts and a warehouseman can issue warehouse receipts. If warehouse receipts are issued, the warehouseman must keep that amount of grain on site. When only weight tickets are issued, there is no requirement that the grain remain "on site."
Grain dealers sell unpriced grain and then buy a contract on the futures market as a hedge. Most grain dealers hedge the sale of unpriced grain. Malone testified that a hedge always works except when the farmer prices his grain, the elevator is unable to pay him.
Several witnesses, including two on the board of directors at the bank where the appellant had his business account, testified to the appellant's good reputation in the community and for truthfulness.
Aubrey Desmukes, Chief of the Gin and Warehouse Division of the State Department of Agriculture, testified as to the various regulations concerning grain dealers and warehouses.
Warehousemen store grain and are responsible for the grain. A warehouse receipt is issued for an amount of grain and the farmer can borrow against it. When a warehouse receipt is issued, the warehouseman must keep that amount of grain on hand.
Grain dealers take title upon delivery of the grain. Desmukes stated that grain dealers often misuse the term storage and storage fee.
Desmukes testified that a public warehouse may operate as a grain dealer. If a warehouseman does not issue receipts, he is operating as a grain dealer. Redmont had a warehouseman's license prior to July 31 of 1983. Redmont never issued warehouse receipts. Desmukes said, therefore, Redmont was a public warehouse operating as a grain dealer.
The triggering mechanism of the warehouseman's act is the understanding that the farmer wishes to store his grain. In this situation, a warehouse receipt must be issued. However, if a farmer says he wants to store and price later, the warehouse *Page 232 
act is not involved and there is no requirement that the grain dealer keep any beans on site without a warehouse receipt.
Grain dealers usually sell the grain which the farmers bring in and then hedge the sale on the futures market. There was nothing wrong, as far as the agriculture regulations are involved, with Redmont receiving beans, selling them, and then hedging them on the futures market. It's the normal procedure because soybeans are partially perishable. Desmukes did not know of any grain dealers who did not operate in this manner. As long as the hedge is maintained, the farmer is protected.
Redmont's license expired on July 31, 1983. Redmont had applied for a license for the year 1983-84, but never received its license because of the bond requirement. If a license is not issued, such a business can operate only on a cash basis. Redmont was not told it would not be licensed until February or March of 1984. Desmukes testified that it was not unusual for a period of time to lapse between the expiration of an old license and the issuance of a new license and grain dealers often operate during that period.
Bill Legg, a field auditor for the State Department of Agriculture, visited Redmont twice a year. Redmont was never cited for any violations of the Department's regulations.
Legg testified that the appellant never issued warehouse receipts and, thus, was not required to keep any beans on the site. If farmers wanted to store their grain, a warehouse receipt should have been issued. If the farmers wanted to price later, a warehouse receipt should not be issued.
Legg testified that 90 to 95 percent of grain elevator operators take in grain, sell it to processors, and then hedge the sale on the futures market. This is a recognized legitimate trade practice.
In the late 1970's, the appellant learned there was an apparent need for a grain elevator in the area. He discussed it with the farmers in the area, the bank, the people in the industry, and had a feasibility study done. The appellant put up $135,000 of his own money to start a grain elevator business and obtained a $400,000 construction loan from the bank for this business. The bank gave the appellant an initial line of credit for his business operating account in the amount of $250,000.
The appellant testified that the farmers would bring in their beans at harvest time and the beans were put in the grain bins. The appellant would then sell the beans and buy an equal amount of beans on the futures market. The appellant had a hedge account with Dean Witter. Reynolds stated that when he sold beans he always bought an equal amount on the futures market and, thus, maintained a "flat position."
When a farmer would come in to sell his beans, the appellant would write the farmer a check and then sell his position on the futures market. By using a hedge, the appellant would lock in his profit, have the use of the money from the sale until the farmer sold, and had no liability for maintaining the beans. He said that most grain elevator operators operate in this way and, if he did not do business this way, he could not have maintained his business due to insufficient operating capital.
The appellant testified that, when a person buys a contract on the futures market, he does not actually pay the contract price. He puts up earnest money, which is a percentage of the contract price.
When the appellant bought a contract with earnest money, he would put the rest of the money from the sale of the beans into his operating account. This was done to reduce the size of his operating account's loan from the bank which would reduce his interest charges.
In the futures market, the appellant had to maintain his daily position with Dean Witter Reynolds. If the market went down, the appellant would have to send money to Dean Witter Reynolds to make the margin calls. If the market went up, Dean Witter Reynolds would deposit money into the appellant's account.
The appellant testified that the reason he got in trouble with "the farmers was his *Page 233 
line of credit was reduced by the bank by $100,000, and, thus, the appellant was not able to make the margin calls which caused his position on the futures market to be liquidated. The appellant said his line of credit was reduced because the bank mistakenly took the $100,000 (which was a loan for the building of his grain bins) from his operating account rather than adding the $100,000 to his original construction note. When the bank reduced his operating account by $100,000, the appellant's cash flow was reduced and he could not make his margin calls. The appellant assigned a commercial building to the bank for security to replace the loss of the $100,000 line of credit. However, the bank did not add the $100,000 back to his line of credit for the business.
The appellant has filed a suit against the bank. He testified that his financial problems were caused by the bank's failure to provide him adequate funding.
The appellant also testified that the years 1981, 1982, and 1983 were "bad crop years," and he was not able to meet his bushel capacity. Interest rates rose from 1980 until 1984, and the appellant paid the bank a very large amount of interest on his operating account.
The appellant also had a speculative account with Dean Witter Reynolds for the purpose of speculating on the futures market. He stated that there was no comingling of funds between his speculative account and the hedge account.
The appellant said that it was his understanding that he was authorized to sell the farmers' beans. He never intended to deprive any of them of their money or property, and he wants and intends to pay the farmers in question.
 I
Our thorough review of the record of this case places us in a troubled position. There is some evidence contained in this record which indicates to us that these criminal charges were brought to force the appellant to pay the farmers the money which he owed them.
Article I, Section 20, Constitution of 1901, provides: "That no person shall be imprisoned for debt."
The Alabama Supreme Court "has spoken with respect to the constitutional provision prohibiting imprisonment for debt, and recognized that this prohibition established a broad public policy '. . . inimical . . . to the incarceration of a debtor as a means of coercing payment. . . .' " Carr v. State,106 Ala. 35, 38, 17 So. 350, 351 (1895)." Tolbert v. State,294 Ala. 738, 321 So.2d 227, 232 (1975).
The criminal law was not designed to enforce the payment of a debt or to adjudicate civil disputes between parties.Hurst v. State, 21 Ala. App. 361, 108 So. 398 (1926). The mere failure to pay a debt, while furnishing a basis for a civil suit is not sufficient to constitute a crime. Hurst, supra. The improper employment of a statute to enforce payment of a debt is an unconstitutional application of that statute. Tolbert, supra.
The Alabama Supreme Court has condemned the use of threat of prosecution as a means of collecting a debt by "the unscrupulous who seek only payment of debts and have no interest in criminal prosecution other than as a means of collecting money allegedly due them." Tolbert, supra, 321 So.2d at 232. Thus, if one is prosecuted under a statute, he must be prosecuted for the crime which he has committed, not for the debt that he owes or to make him pay it. Cottonreeder v. State,389 So.2d 1169 (Ala.Cr.App. 1980).
The difference between the improper use of a statute as a means of punishment for debt and the proper use of a statute as a means of punishment for a criminal act is intent. Harris v.State, 378 So.2d 257 (Ala.Cr.App.), cert. denied, 378 So.2d 263
(Ala. 1979). A mere failure or inability to pay a debt does not necessarily constitute theft. Theft requires the specificintention to deprive which cannot be inferred from the mere naked fact of nonpayment of a debt. Thus, the theft statute was designed to punish those who exert unauthorized control over the property of *Page 234 
another with the intent to deprive that person of his property and not to punish persons who are unable to pay a debt.
The central and critical issue in this case is thisappellant's intent. In a theft case, intent is a question for the jury. McCord v. State, 501 So.2d 520 (Ala.Cr.App. 1986). However, intent is difficult to prove and must be inferred fromall the facts and circumstances of the case. Ex parte Reid,474 So.2d 151 (Ala. 1985).
When a material element of a crime is the accused's intent, "both the State and the accused are allowed broad scope in introducing evidence with even the slightest tendency to establish or negate such intent. . . .' " Reid, supra, at 153, citing Cottonreeder, supra. "The evidence of collateral conduct which would be deemed admissible under this principle 'is ordinarily produced for the purpose of showing criminal or fraudulent intent, [but] may with equal logic be offered to show the lack of such intent.' Gard, Jones on Evidence — Civiland Criminal, Vol. 1, § 4:13 (6th ed. 1972)." Reid, supra, at 153.
During the course of this trial, the appellant was not allowed to present evidence concerning his financial arrangements with the bank or conversations he had with the bank. (See R. 684, 692.) Redmont's manager was not allowed to testify about the interest rates during the time Redmont was in business nor about what he did when Redmont's bank account had insufficient funds to cover checks which he had written. (See R. 541, 568.)
Redmont's bookkeeper was not allowed to testify as to how much Redmont paid the bank in interest charges. (See R. 601.) The appellant's accountant was not allowed to testify as to whether the appellant or Redmont had ever been audited or had any problems with the I.R.S. (See R. 615, 616, 632.)
The appellant was not allowed to question another grain dealer as to whether he had ever operated during a time when his license had expired and before a new one was issued. (See R. 655-56.) The appellant was not allowed to testify whether he had engaged in "check kiting."
Further, he was not allowed to present evidence as to the reason he was prevented from having a sale of his assets in order to pay the farmers for their beans.
The appellant also complains that two of the farmers he questioned should have been allowed to testify as to whether he intended to deprive them of their beans. The trial judge ruled correctly in these instances because, while a witness may testify as to his own intent, Starr v. Starr, 293 Ala. 204,301 So.2d 78 (1974), he may not testify as to the intent of another. Body v. State, 341 So.2d 744 (Ala.Cr.App. 1976), cert. denied, 341 So.2d 748 (Ala. 1977); Flanagan v. State,369 So.2d 46 (Ala.Cr.App. 1979); Magwood v. State, 494 So.2d 124
(Ala.Cr.App. 1985), affirmed, 494 So.2d 154 (Ala. 1986);Nikolic v. Montgomery, 441 So.2d 997 (Ala.Cr.App.), cert. denied, 441 So.2d 997 (Ala. 1983); see also C. Gamble,McElroy's Alabama Evidence, § 102.07 (3d ed. 1977).
The appellant contends that the above evidence concernedhis intent and, thus, the evidence should have been allowed. We agree that some of this evidence should have been allowed. The testimony by the two farmers regarding intent was properly excluded as we have indicated.
In Reid, supra, the defendant was convicted of theft in the first degree for allegedly misrepresenting that he would make his postdated bank check issued to the payee, in return for some equipment, valid at a subsequent time. At trial, the defendant was prevented from presenting evidence of the intervention of several bonding companies in his failing business and the preemption of control by the bonding companies which effectively precluded the defendant's further management of the affairs of his business.
The Alabama Supreme Court reversed that defendant's conviction holding that the above evidence should have been admitted because it was relevant as to the issue of whether the defendant had the requisite intent. *Page 235 
In Reed v. State, 32 Ala. App. 338, 27 So.2d 22 (1945), the appellant was convicted of larceny of some corn. The defendant, a tenant share cropper, stored his corn in his landlord's crib. At some point, the defendant removed his corn to his own farm. The landlord claimed the defendant had sold the corn to him, and, therefore, the defendant stole the corn.
At trial, the defendant was not allowed to present evidence that he had consulted a lawyer regarding his rights to move the corn. His conviction was reversed on the grounds that he should have been allowed to present this evidence because it was proof of his lack of intent.
The above cases illustrate that proof of one's guilt or innocence in a theft case necessarily includes evidence ofany events or circumstances concerning the accused's intent.
Here, the appellant was prevented from introducing certain evidence, particularily evidence concerning his finances and his dealing with the bank, which would have been relevant to show his intent. He attempted to prove that the financial difficulties which he had with the bank made him unable to fullfil his bargain with the farmers who had left beans. Evidence of the appellant's inability to pay the farmers and the cause and reasons for his inability to pay is certainly of probative value in this cause. Evidence of facts and circumstances prior and subsequent to the time that this appellant sold the beans and bought an equal amount on the futures market would be relevant and material to the question of whether the appellant had the requisite intent to commit theft. Reid, supra.
"The factual issues in the case were closely intwined around the inquiry of felonious intent. The appellant should, therefore, have been permitted to put into evidence any material facts which would tend to disprove this intent."Reed, supra, 32 Ala. App. at 340, 27 So.2d 22.
For the reasons stated above, this cause is due to be, and is hereby, reversed and remanded to the trial court for a new trial.
REVERSED AND REMANDED.
All the Judges concur.